# EXHIBIT 1

Case 1:08-cv-00151    Document 18-2    Filed 05/14/2008    Page 2 of 24
Case 1:07-cv-03414    Document 30    Filed 03/04/2008    Page 2 of 49
Case 1:07-cv-05379    Document 15    Filed 02/25/2008    Page 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NAJEH EL MASRI,                         )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        No.  07 C 5379
                                        )
RUTH DOROCHOFF, et al.,                 )
                                        )
                Defendants.             )

MEMORANDUM ORDER

This is one of an endless stream of cases seeking the
adjudication of applications for naturalization, all stemming
from the appalling failure of the FBI to conduct and complete
countless background checks of such applicants--a failure that
has in turn prevented the conduct of interviews of the applicants
by the United States Citizenship and Immigration Services
("CIS"), as is required by 8 U.S.C. §1446(a)[1] before adjudication
of such applications.  Most such actions follow the same form as
this one, seeking mandamus relief.  And as is frequently the
case, the government defendants have filed a motion to dismiss
under Fed. R. Civ. P. ("Rule") 12(b)(6), to which counsel for
plaintiff Najeh El Masri ("El Masri") have filed a responsive
memorandum.

In conceptual terms the government's position partakes in
part of the elements of a shell game:  It makes the undisputed

_____

        [1]    All further references to Title 8's provisions will
simply take the form "Section--."

Case 1:08-cv-00151    Document 18-2    Filed 05/14/2008    Page 3 of 24
Case 1:07-cv-03414    Document 30    Filed 03/04/2008    Page 3 of 49
Case 1:07-cv-05379    Document 15    Filed 02/25/2008    Page 2 of 3

point that mandamus relief is available only if a plaintiff has a clear right to relief and a defendant has a duty to act, and it proceeds from there to urge that Congress has not imposed a duty to act on the FBI. But that wholly ignores the fact that Section 1446(a) expressly requires confirmation from the FBI that it has completed a full criminal background check as a precondition to CIS' adjudication of the application for naturalization.

Here El Masri's counsel has pointed to the extensive discussion in Iddir v. INS, 301 F.3d 492 (7th Cir. 2002) in support of the potential for the granting of mandamus relief. And counsel also invokes the thoughtful and extended treatment of the subject in the opinion by this Court's colleague Honorable Matthew Kennelly (with whom this Court finds itself in total agreement) in He v. Chertoff, No. 07 C 363, ___ F.Supp.2d ___, 2008 WL 36634, at *2-*4 (N.D. Ill. Jan. 2). Accordingly this Court holds that dismissal of this action at this point would be premature, for a factual fleshing out is necessary in light of the generous standards applicable under Rule 12(b)(6), even after imposing the "plausibility" requirement announced in Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65, 1974 (2007) as further amplified in EEOC v. Concentra Health Servs., 496 F.3d 773, 776 (7th Cir. 2007).

Accordingly the defense motion for dismissal is denied, and defendants are ordered to answer the Petition for Writ of

Case 1:08-cv-00151   Document 18-2   Filed 05/14/2008   Page 4 of 24
Case 1:07-cv-03414   Document 30   Filed 03/04/2008   Page 4 of 49
Case 1:07-cv-05379   Document 15   Filed 02/25/2008   Page 3 of 3

Mandamus on or before March 10, 2008.  This action is also set
for a next status hearing at 8:45 a.m. March 13, 2008, at which
time defense counsel should be prepared to provide current
information as to the status of El Masri's background check by
the FBI.

Milton I. Shadur
Senior United States District Judge

Date:  February 25, 2008

3

# EXHIBIT 2

The New York Times

February 12, 2008

# Rules Eased to Expedite Green Card Applications

By JULIA PRESTON

Searching for ways to reduce a huge backlog of visa applications, immigration authorities have eased requirements for background checks by the F.B.I. of immigrants seeking to become permanent United States residents, federal officials said Monday.

If an immigrant's application for a residence visa has been in the system for more than six months and the only missing piece is a name check by the F.B.I., immigration officers will now be allowed to approve the application, according to a memorandum posted Monday on the Web site of the federal Citizenship and Immigration Services agency.

The memorandum states that "in the unlikely event" that the F.B.I. name check turns up negative information about an immigrant after a residence visa has been granted, the authorities can cancel the visa and begin deportation proceedings.

The document was written by Michael Aytes, the agency's associate director for domestic operations.

Under the new policy, which was first reported by the McClatchy news service, immigrants applying for the permanent visas, which are known as green cards, will still be required to complete two other security checks: an F.B.I. criminal fingerprint check and a search in a federal criminal and anti-terrorist database known as Interagency Border Inspection Services.

The F.B.I. will eventually complete name checks for all green card applicants, officials said. Immigrants seeking to become citizens will still have to wait until the name check is completed.

"Only after we received assurances that this would not compromise national security or the integrity of the immigration system did we go forward," said Christopher S. Bentley, a spokesman for Citizenship and Immigration Services. "This will allow us to give benefits to people who deserve them in a much quicker time frame."

The policy is intended to speed processing for tens of thousands of immigrants with no criminal records who are living in the United States and have been waiting for years for green cards because their names turned up matches in the F.B.I.'s records. Often an immigrant's name hits a match, immigration lawyers said, because the F.B.I. files include a vast range of names, including those of people mentioned in criminal investigations, even if they had no role in a crime. F.B.I. agents must investigate each name match by manual searches of voluminous records.

The previous policy "was just stalling adjustment of status for hundreds of thousands of people who posed no security threat, without any demonstrable improvement to our national security," said Bo Cooper, an

Rules Eased to Expedite Green Card Applications - New York Times                    Page 2 of 2

immigration lawyer who was formerly general counsel for the immigration service.

Currently the agency processes about 1.5 million applications requiring name checks each year, Mr. Bentley said, and 99 percent are cleared by the F.B.I. in less than six months. But about 140,000 applications have been hung up in the system for more than six months because of the name checks, he said, including applications both for green cards and citizenship.

Some critics said the agency would be cutting security corners and bending federal law.

"They are knowingly granting a benefit to a person who may be a national security threat or a serious criminal," said Rosemary Jenks, director of government relations for NumbersUSA, an organization that favors reduced immigration.

"These are people who are asking permission to stay in this country permanently," Ms. Jenks said, "and we have a right to make sure we know who they are. If it takes a few extra months, so be it."

But Representative Zoe Lofgren, Democrat of California and chairwoman of the House immigration subcommittee, said the number of immigrants who had ever been rejected solely as a result of an F.B.I. name check was "microscopic."

Copyright 2008 The New York Times Company

Privacy Policy  |  Search  |  Corrections  |  RSS  |  First Look  |  Help  |  Contact Us  |  Work for Us  |  Site Map

# EXHIBIT 3

*Press Office*
U.S. Department of Homeland Security



U.S. Citizenship
and Immigration
Services

April 25, 2006

# Immigration Security Checks—How and Why the Process Works

## Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

## Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Immigration Security Checks—How and Why the Process Works

___

## How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check**— IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check**—FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks**—FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# EXHIBIT 4

Westlaw.

Slip Copy                                                                                                           Page 1
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
(Cite as: Slip Copy)

c
Antonishin v. Keisler
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                        Division.
    Sergey ANTONISHIN, et al. individually and on
    behalf of a class of similarly situated persons,
                        Plaintiffs,
                            v.
        Peter D. KEISLER, et al., Defendants.
                    No. 06 CV 2518.

                    Sept. 20, 2007.

                *MEMORANDUM OPINION*

JOHN F. GRADY, United States District Judge.
    *1 Defendants have moved to dismiss
plaintiffs' complaint pursuant to Fed.R.Civ.P.
12(b)(1) and 12(b)(6). Alternatively, defendants ask
us to remand the named plaintiffs' applications to
the United States Citizenship and Immigration Ser-
vices ("USCIS") pursuant to 8 U.S.C. § 1447(b).
For the reasons explained below, we grant defend-
ants' motion in part and deny it in part.

                    *BACKGROUND*

    Plaintiffs are lawful permanent residents of the
United States who have applied to be naturalized as
United States citizens. (Compl.¶ 3.) As part of the
application review process, USCIS conducts back-
grounds checks of each applicant. (*Id.* at ¶
42.)[FN1]These background checks include: (a) an
FBI fingerprint check; (b) a search of the Inter-
agency Border Inspection System ("IBIS"), which
contains records information "from more than 20
federal law enforcement agencies;" and (c) an FBI
"name check," which is "run against FBI investig-
ative databases containing information that is not
necessarily revealed by the FBI's fingerprint check
or IBIS."(*Id.* at ¶ 47.)The name and fingerprint

checks were first implemented in 1998, after Con-
gress prohibited USCIS from using any appropri-
ated funds to adjudicate any naturalization applica-
tion without first confirming that the FBI had com-
pleted a "full criminal background check" of the
applicant. Department of Justice Appropriations
Act of 1998, Pub.L. No. 105-119, Title I, Nov. 26,
1997, 111 Stat. 2448. The FBI, in turn, performs
the background checks at USCIS' request on a
"fee-for-service" basis "according to USCIS-
defined standards." *See* Citizenship and Immigra-
tion Services Ombudsman Annual Report 2007
(hereinafter "Ombudsman Report"), attached as Ex-
hibit 2 to Plaintiffs' Second Notice of New Author-
ity, at 38.

    FN1. Defendants have attached lengthy de-
    clarations to their motion to dismiss de-
    scribing the background check, generally.
    We have excluded these materials in ruling
    on defendants' motion to dismiss except
    for those portions of defendants' declara-
    tions that plaintiffs cite in their Second
    Amended Complaint. *See, e.g.,* Compl. ¶
    48; *see also Venture Associates Corp. v.
    Zenith Data Systems Corp.,* 987 F.2d 429,
    431 (7th Cir.1993) ( "Documents that a de-
    fendant attaches to a motion to dismiss are
    considered part of the pleadings if they are
    referred to in the plaintiff's complaint and
    are central to her claim.").

    When USCIS first implemented the name-
check requirement in late 1997, applicant names
were checked against the FBI's "main" files only.
(Compl.¶ 44, 47-48.) In November 2002, without
prior notice and without accepting public comment,
USCIS and the FBI agreed to expand the name
check to include "references" to the applicant's
name in the FBI's files. (Compl. ¶ 48; Ombudsman
Report at 28 ("[T]he FBI provides information to
USCIS regarding anyone who is the principal sub-
ject of an investigation or is a person referenced in
a file.")) The new search criterion increased the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
**(Cite as: Slip Copy)**

amount of time required to complete certain name checks and has caused delays in the review process, generally. (Compl. ¶ 49; Pl. Opp'n at 20).

Before receiving the results of plaintiffs' background checks, USCIS interviewed each plaintiff to ascertain his or her command of English and to address any other concerns that USCIS might have about his or her application. (Compl.¶ 31.) Plaintiffs cite Department of Homeland Security ("DHS") data indicating that USCIS adjudicates more than 50% of all cases on the same day that it interviews the applicant. *Id.* at ¶ 33.Approximately 90% of all applications are adjudicated within 120 days of the interview. *Id.* Plaintiffs fall within the remaining 10%: although all of the plaintiffs' interviews were completed before January 5, 2006, to date the USCIS has not adjudicated their applications. *Id.* at ¶¶ 22-26.

*2 Plaintiffs have filed a six count complaint. Counts I-V are brought on behalf of a putative class of applicants in Illinois, Indiana and Wisconsin. Count I, brought against the "Immigration Defendants" (DHS, USCIS, Dorochoff and Chertoff), alleges that systematic delays in the naturalization application system violate the Administrative Procedures Act ("APA"). Count II, also brought against the Immigration Defendants, asserts a claim for mandamus relief for failing to adjudicate plaintiffs' applications in a "timely manner." Count III, brought against the "FBI Defendants" (Mueller and the FBI), asserts a claim for mandamus relief for failure to complete name checks in a timely manner. Count IV alleges that USCIS failed to follow required notice and comment procedures when it adopted the name check requirement. Count V alleges that the delays that plaintiffs have experienced relative to other applicants violates the equal protection component of the Fifth Amendment. In Count VI, brought by the named plaintiffs on their own behalf, plaintiffs ask us to adjudicate their naturalization applications pursuant to 8 U.S.C. § 1447(b).

*DISCUSSION*

**I. *Motion to Dismiss Standard***

When considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a district court accepts as true all well-pled factual allegations and draws reasonable inferences from the allegations in favor of the plaintiff. *Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir.1993). The court may also look beyond the allegations of the complaint and consider affidavits and other documentary evidence to determine whether subject matter jurisdiction exists. *Id.*

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed.2004). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1173 (7th Cir.1999); *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Cir.1997).

**II. *Claims Brought On Behalf of the Named Plaintiffs Only***

**A. *Subject Matter Jurisdiction***

Defendants contend that this court lacks jurisdiction to adjudicate the plaintiffs' applications. Congress has expressly limited federal courts' jurisdiction to adjudicate naturalization applications:

If there is a failure to make a determination under section 1446 before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
**(Cite as: Slip Copy)**

matter, with appropriate instructions, to the Service to determine the matter.

*3 8 U.S.C. § 1447(b). Whether we have jurisdiction turns on the proper interpretation of "examination," which is not defined in the statute. Defendants contend that "examination" means the entire investigative process prior to adjudication, including the background checks. The 120-day period has not been triggered, they argue, because plaintiffs' background checks are not complete. Plaintiffs, for their part, maintain that "examination" refers to the USCIS interview. Considerably more than 120 days elapsed after plaintiffs' interviews before they filed their complaint.

Defendants rely primarily on *Danilov v. Aguirre,* 370 F.Supp.2d 441 (E.D.Va.2005) to support their interpretation of "examination." [FN2] In *Danilov,* the court concluded that § 1446 ("Investigation of applicants; examination of applications") describes a "process to gather information concerning the applicant," not a "single event." *Id.* at 443. The court reached this conclusion based upon provisions of § 1446 authorizing the examiner to issue subpoenas requiring witness testimony and document production. *Id.* Moreover, 8 C.F.R. § 335.2 prohibits the USCIS from scheduling an applicant's "initial examination" before the FBI provides a "definitive response" concerning the applicant's background check. *Id.* at 444. The *Danilov* court reasoned, somewhat circularly, that the fact that the plaintiff's interview occurred before USCIS received a response from the FBI meant that the interview was not the "examination." *Id.*

FN2. Defendants also rely on *Walji v. Gonzales,* --- F.3d ----, 2007 WL 174911 (5th Cir.2007), which reached the same conclusion as the court in *Danilov,* though for different reasons. However, the Fifth Circuit has since withdrawn its opinion, and on September 14, 2007 issued a superseding opinion in which it reversed course and held that an applicant's interview is the

"examination" for purposes of § 1447(b). *See Walji v. Gonzales,* No. 06-20397, at 16 (5th Cir. Sept. 14, 2007) (attached as Ex. A to Plaintiff's Notice of Fifth Circuit Reversal of Its Walji Opinion).

We are not persuaded by the reasoning in *Danilov* to part ways with the majority view that the "examination" is the applicant's interview. *See Repeshchuk v. Gonzales,* Civ. No. 07-2017 (RHK/AJB), 2007 WL 2361450, *2 (Aug. 15, 2007) (noting that an "overwhelming majority of federal courts" have rejected the reasoning in *Danilov* ). The fact that § 1446 authorizes the examiner to issue subpoenas "[f]or purposes of" conducting the examination does not mean that the examination itself is not a discrete event. Later in the same section the statute provides that the examiner "shall, *at the examination,* inform the applicant of the remedies available to the applicant under section 1447 of this title." *Id.* (emphasis added). Other provisions of the statute and implementing regulations also support interpreting "examination" to mean the applicant's interview. Section 1447(b) refers to "the date on which the examination is conducted pursuant to section 1446," strongly implying that the "examination" is a discrete event and not an ongoing process. *See* 8 U.S.C. § 1447(b); *El-Daour v. Chertoff,* 417 F.Supp.2d 679, 681 (W.D.Pa.2005). *Danilov* is also difficult to square with 8 C.F.R. § 335.2, which equates the "examination" with the "interview" conducted by the Service officer:

Subsequent to the filing of an application for naturalization, each applicant shall *appear in person before a Service officer designated to conduct examinations* pursuant to § 335.1 of this chapter.

*4 ...

Prior to the *beginning of the examination,* the Service officer shall make known to the applicant the official capacity in which the officer is conducting the examination....*The Service officer shall maintain, for the record, brief notations of the examination for naturalization.* At a minimum, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
**(Cite as: Slip Copy)**

notations shall include a record of the test administered to the applicant on English literacy and basic knowledge of the history and government of the United States. The Service officer may have a stenographic, mechanical, electronic, or videotaped transcript made, or may prepare an affidavit covering the testimony of the applicant.

8 C.F.R. § 335.2 (emphasis added).Section 335.2(b) also provides that USCIS may schedule the "examination" only after receiving a "definitive response" from the FBI. *Id.* at § 335.2(b).[FN3] This procedure does not make sense if the background check is part of, not separate from, the examination. *See Khelifa v. Chertoff,* 433 F.Supp.2d 836, 841 (E.D.Mich.2006).

> FN3. In this case, and in numerous other cases, the USCIS disregarded its own regulation and performed the interview without first obtaining the a "definitive response" from the FBI. *See* 8 C.F.R § 335.2; *see also Alhamedi v. Gonzales,* No. 07 Civ. 2541(JGK), 2007 WL 1573935, *4 (S.D.N.Y. May 30, 2007) ("CIS could have avoided the present problem by following its own regulations and postponing its "examination" of Alhamedi until the FBI had cleared his name, but that path was not taken.").

Consistent with the great majority of courts to consider this issue, we conclude that the statute confers federal court jurisdiction 120 days after the applicant's USCIS interview. Accordingly, we have subject matter jurisdiction over plaintiffs' naturalization applications.

**B. Remand**

Section 1447(b) authorizes us to "either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter." 8 U.S.C. § 1447(b). We conclude that remand is appropriate, consistent with the "vast ma-

jority" of courts that have addressed the issue. *Manzoor v. Chertoff,* 472 F.Supp.2d 801, 810 (E.D.Va.2007). USCIS possesses expertise in this area and should be given the opportunity to adjudicate plaintiffs' applications in the first instance. *See Immigration & Naturalization Service v. Ventura,* 537 U.S. 12, 16-17 (2002) (remand is generally the better course and "[t]his principle has obvious importance in the immigration context.").[FN4] Moreover, we decline to impose any particular deadline for adjudication of plaintiff's applications on remand. Once plaintiffs' name checks are complete "there should be no impediment to prompt resolution" of their applications. *Walji,* 06-cv-02518, at 16. If for some reason their applications are not resolved within a reasonable time after completion of the name checks, plaintiffs again have recourse to appropriate judicial relief under § 1447(b).

> FN4. Because we have determined that remand is appropriate, we do not reach defendants' argument that plaintiffs' claims should be severed before conducting individualized hearings to adjudicate their applications. *See* Mot. to Dismiss at 12.

**III. *Claims Brought On Behalf of the Class***

**A. *The Timing of Defendants' Dispositive Motion***

As a threshold matter, we note that defendants have filed their motion to dismiss even though plaintiffs have not yet moved for class certification. Generally speaking, decisions on the merits of a plaintiff's claim should be made after determining whether to grant or deny class certification. *See* Fed.R.Civ.P. 23(c) ("When a person sues or is sued as a representative of a class, the court must-at an early practicable time-determine by order whether to certify the action as a class action."); *Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 475 (7th Cir.1997). However, the Seventh Circuit has recognized that in certain circumstances district courts may proceed to rule on a dispositive motion without first ruling on class certification. *See*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
**(Cite as: Slip Copy)**

*Cowen v. Bank United of Texas, FSB,* 70 F.3d 937, 941 (7th Cir.1995). As the Court noted in *Cowen,*"[c]lass actions are expensive to defend. One way to try to knock one off at low cost is to seek summary judgment before the suit is certified for class action."*Id.* The Court in *Cowen* concluded that this tactic is proper, *id.,* and we see no reason it would not be proper in connection with a motion to dismiss. *See, e.g., Griffin v. Humana Wis. Health Org. Ins. Corp.,* No. 98-C-0001, 2000 WL 35572299, *2 (E.D. Wis. June 26, 2000) (applying the principle in *Cowen* to a motion to dismiss). Accordingly, we proceed to consider defendants' motion to dismiss those Counts brought on behalf of a putative class of applicants.

### B. *APA and Mandamus Claims Against USCIS*

*5 Plaintiffs assert claims against USCIS for relief pursuant to the APA and for mandamus. In Count I(APA), plaintiffs allege that USCIS has engaged in a "pattern and practice of failing to adjudicate naturalizations within a reasonable period of time, which practice should be corrected."(Compl.¶ 55.) Count II requests mandamus relief for essentially the same conduct-failure to adjudicate applications in a "timely manner." (Compl.¶¶ 56-59.) In their prayer for relief, plaintiffs ask us to order defendants to adjudicate all naturalization applications within 120 days of the examination. (Compl.¶ G.) By its terms, such an order would require USCIS to proceed even without a "definitive response" from the FBI. Under the APA, the "only agency action that can be compelled under the APA is action legally required."*Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 63 (2004). Plaintiffs must satisfy a similar requirement for mandamus relief. *Scalise v.. Thornburgh,* 891 F.2d 640, 648 (7th Cir.1989), cert. denied, 494 U.S. 1083 (1990) (The defendant must have "a plainly-defined and peremptory duty to do the act in question"). USCIS has no duty to adjudicate a naturalization application before receiving a "definitive response" from the FBI that the applicant's background check is complete. Indeed, it is prohibited from doing so. Department of

Justice Appropriations Act of 1998, Pub.L. No. 105-119, Title I, Nov. 26, 1997, 111 Stat. 2448; 8 C.F.R. § 335.2(b) .[FN5]

> FN5. Plaintiffs imply that this problem would largely resolve itself if we eliminated the name check requirement, as it is the chief source of the delays. For the reasons discussed *infra,* we decline to abolish the name check requirement.

In their opposition to defendant's motion to dismiss, plaintiffs ask us to take the somewhat less drastic step of requiring USCIS to request expedited name checks whenever a name check is still pending 120 days after the applicant's examination. USCIS can and does ask the FBI to expedite name checks in limited circumstances.[FN6]But plaintiffs have not cited any statute or regulation *requiring* USCIS to request expedition under any circumstances. *See Norton,* 542 U.S. at 63;*Scalise,* 891 F.2d at 648 (7th Cir.1989), cert. denied, 494 U.S. 1083 (1990) Congress has set a normative expectation that applications will be adjudicated within 180 days after the application. 8 U.S.C. § 1571. We do not believe that this expectation compels the agency to request expedition when a name check has been pending for a longer period of time. Accordingly, we decline to rewrite USCIS's expedition policy.

> FN6. In deciding whether to request an expedited name check, USCIS may consider, among other criteria, "[m]ilitary deployment" and "critical medical conditions." *See* USCIS Clarifies Criteria to Expedite FBI Name Check, available at http:// www.uscis.gov/files/pressrelease/Expedite NameChk022007.pdf. On February 20, 2007, USCIS discontinued its policy of requesting expedited name checks whenever an applicant filed a federal lawsuit. *Id.* Without expressing an opinion about whether that criterion was appropriate, we note that it is no longer a basis for challenging USCIS's policy.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2788841 (N.D.Ill.)

**(Cite as: Slip Copy)**

Finally, we note that plaintiffs have an adequate remedy under § 1447(b).*See Walsh v. United States Dept. of Affairs,* 400 F.3d 535, 537-38 (7th Cir.2005) (APA relief is not available if plaintiff has an adequate legal remedy); *Iddir v. I.N.S.,* 301 F.3d 492, 498 (7th Cir.2002) (mandamus relief is not available if plaintiff has an adequate legal remedy); *cf., Kaplan v. Chertoff,* 481 F.Supp.2d 370, 400 (E.D.Pa.2007) (noting that APA relief may be appropriate "where § 1447 provides no avenue for the court to adjudicate the application."). Under both Counts I and II plaintiffs assert a right to have their applications adjudicated within a reasonable time frame. As previously discussed, we obtained jurisdiction over the adjudication process 120 days after plaintiffs' initial examination. Although we have declined to do so here, this provision authorizes district courts to, among other things, order USCIS to request expedited name checks. Accordingly, plaintiffs need not rely on a general jurisdictional grant to obtain the relief that they seek. *See Bowen v. Massachusetts,* 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) ( "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."); *Alsamir v. United States Citizenship and Immigration Services,* No. 06-cv-01751-WDM-BNB, 2007 WL 1430179, at *2 (D.Colo. May 14, 2007) (concluding that the availability of § 1447(b) review precludes mandamus and APA relief).

**C. Claims Against the FBI**

*6 The practical effect of accepting jurisdiction and remanding to USCIS may be negligible where, as here, the applicant's name check results are pending. Several courts have remanded to USCIS with directions to both USCIS and the FBI to complete their review within a specified time frame. *See, e.g., Alhamedi v. Gonzales,* No. 07 Civ. 2541(JGK), 2007 WL 1573935, at *4-5 (S.D.N.Y. May 30, 2007). However, Section 1447(b), standing alone, does not authorize us to order the FBI to expedite plaintiff's name checks. *See*8 U.S.C. §

1447(b) (A court may "either determine the matter or remand the matter, with appropriate instructions, *to the Service* to determine the matter.") (emphasis added). Accordingly, there would have to be some other basis for such an order. We now turn to that issue.

*1. APA Claim Against the FBI*

Plaintiffs contend that we may compel the FBI to expedite its name checks pursuant to APA § 706(1), which requires us to "compel agency action unlawfully withheld or unreasonably delayed."5 U.S.C. § 706(1). However, as we previously discussed, the "only agency action that can be compelled under the APA is action legally required."*Norton,* 542 U.S. at 63. There is no statute or regulation that "expressly imposes a mandatory duty on the FBI to perform background checks."*Kaplan,* 481 F.Supp.2d at 400;*cf. Yakubova v. Chertoff,* 06-CV-3203, at 6 (E.D.N.Y. Nov. 1, 2006) (unpublished opinion attached as Ex. A to Pl. Opp'n) (assuming without analysis that the FBI has a mandatory duty to complete name checks). On this basis, several courts considering APA and mandamus claims in connection with adjustment-of-status requests have concluded that the FBI has no duty to complete background checks.[FN7]Claims against the FBI in connection with naturalization applications are arguably on a different footing, insofar as Pub.L. No. 105-119 explicitly refers to naturalization applications:

> FN7.*See Konchitsky v. Chertoff,* No. C-07-00294 RMW, 2007 WL 2070325, at *6 (N.D.Cal. July 13, 2007) ("[C]ourts squarely addressing the issue of whether they have jurisdiction to compel the FBI to perform name checks in connection with adjustment of status petitions have overwhelmingly concluded that they do not"); *Zaytsev v. Gantner,* No. 04 Civ.7101 WHP, 2004 WL 2251665, at *1 (S.D.N.Y. Sept. 24, 2004) ("The Zaytsevs have pointed to no authority demonstrating that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
**(Cite as: Slip Copy)**

FBI owes a duty to conduct background checks, and this Court has found no such authority.").

[D]uring fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to the Immigration and Naturalization Service shall be used to complete *adjudication of an application for naturalization* unless the Immigration and Naturalization Service has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed.

Department of Justice Appropriations Act of 1998, Pub.L. No. 105-119, Title I, Nov. 26, 1997, 111 Stat. 2448 (emphasis added). Congress has further provided that the FBI may establish fees for name-check costs. Pub. Law 105-515, 104 Stat. 2101, 2112 (1990). The court in *Kaplan* concluded that, "[u]nder these limited circumstances," Congress had, "by implication, imposed on the FBI a mandatory duty to complete the background checks."481 F.Supp.2d at 370.

We are not persuaded by *Kaplan* to infer a mandatory duty under these circumstances. Pub.L. No. 105-119 is addressed to USCIS and establishes conditions that USCIS must satisfy to access appropriated funds. It is at best unclear whether Congress intended to impose any mandatory duty on the FBI. We decline to infer such a duty based on an appropriations measure directed to a different agency. We conclude that plaintiffs have not stated a claim for APA relief against the FBI.

*2. Mandamus Claim Against the FBI*

\*7 As an alternative basis for compelling the FBI to expedite their name checks, plaintiffs assert a claim for mandamus relief. Mandamus is an "extraordinary remedy" that a court may invoke only when each of three elements is present: (1) the plaintiff has a clear right to the relief he seeks; (2) the defendant has a plainly-defined and peremptory duty to do the act in question; and (3) no other ad-

equate remedy is available. *Scalise*, 891 F.2d at 648. For the reasons discussed in connection with plaintiffs' APA claim, we conclude that the FBI has no "plainly-defined and peremptory duty" to complete the name checks. *See Eldeeb v. Chertoff*, No. 8:07-cv-236-T-17EAJ, 2007 WL 2209231, at \*22 (M.D.Fla. July 30, 2007) (dismissing complaint and concluding that the FBI does not owe a "clear" duty to lawful-permanent-resident applicants to process name checks). Accordingly, mandamus is not appropriate.

**D.  *APA Claim Based on Adoption of the "References" Check***

In 1997 Congress prohibited USCIS from using any appropriated funds to adjudicate any naturalization application without first confirming that the FBI had completed a "full criminal background check" of the applicant. Department of Justice Appropriations Act of 1998, Pub.L. No. 105-119, Title I, Nov. 26, 1997, 111 Stat. 2448. In response, USCIS adopted 8 C.F.R. § 335.2(b):

(b) Completion of criminal background checks before examination. The Service will notify applicants for naturalization to appear before a Service officer for initial examination on the naturalization application only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed. A definitive response that a full criminal background check on an applicant has been completed includes:

(1) Confirmation from the Federal Bureau of Investigation that an applicant does not have an administrative or a criminal record;

(2) Confirmation from the Federal Bureau of Investigation that an applicant has an administrative or a criminal record; or

(3) Confirmation from the Federal Bureau of Investigation that two properly prepared fingerprint cards (Form FD-258) have been determined unclassifiable for the purpose of conducting a criminal background check and have been rejected.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
**(Cite as: Slip Copy)**

8 C.F.R. § 335.2(b). From 1998 until approximately November 2002, USCIS requested that the FBI search its "main" files only. At that point, USCIS began requesting a broader search for "references" to the applicant's name in FBI files.

Plaintiffs contend that the decision to review "references" was improperly made without notice and comment. *See* 5 U.S.C.A. § 553. "The APA mandates that an agency follow its notice and comment procedures when promulgating" a legislative rule. *Board of Trustees of Knox County Hosp. v. Shalala,* 135 F.3d 493, 500 (7th Cir.1998). A legislative rule "create[s] law, usually implementary to an existing law." *Id.* On the other hand, the APA's notice-and-comment requirement does not apply "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *See* 5 U.S.C.A. § 553(b). Interpretive rules are statements "as to what the administrative officer thinks the statute or regulation means." *Board of Trustees,* 135 F.3d at 501 (internal citation and quotation marks omitted). The paradigmatic interpretive rule is one which expressly references the statute being interpreted. *Metropolitan School District of Wayne Township, Marion County, Indiana v. Davila,* 969 F.2d 485, 490 (7th Cir.1992). Nevertheless, a rule may be interpretive even if there is no such reference. *See, e.g., Knox,* 135 F.3d at 501 (concluding that the agency's policy statement impliedly interpreted the agency's regulation).

*8 Defendants have not identified a reference to the relevant statute or regulation contemporaneous with expanding the name check program. It is apparent, however, that USCIS was interpreting the scope of the "full criminal background check." [FN8] It did not create a new law, right or duty. *Metropolitan School Dist. Of Wayne Twp., Marioun County, Ind. v. Davila,* 969 F.2d 485, 490 (7th Cir.1992) ("[I]f by its action the agency intends to create new law, rights, or duties, the rule is properly considered to be a legislative rule."). The parameters of a "full criminal background check" are

not self-defining. USCIS might well have required a "reference" name check in 1997, when Congress imposed the "full criminal background check" requirement. *See Stepchuk v. Gonzales,* No. C06-570RSL, 2007 WL 185013, at *2 (W.D.Wash. Jan. 18, 2007) ("[T]he FBI's name check may be considered a part of the requirement for a 'full criminal background check.' "). *Shalabi,* 2006 WL 3032413, at *2 ("A 'name check' may certainly be read into the requirement of a full criminal background check."); *cf. Hoctor,* 82 F.3d at 169 (7th Cir.1996) (concluding that the USDA's arbitrary eight-foot fence requirement could not be construed as "interpreting" a regulation concerning the "strength" of such enclosures). The fact that it was implemented in 2002 does not make the change legislative. *Id.* at 491 ("[A]n agency's change in its reading of a statute does not necessarily make the rule announcing the change legislative."). Although delays caused by the name check are significant, the impact is incidental. *Id.* at 493 ("Prevailing authority rejects the proposition that a rule that has substantial impact is necessarily legislative."). We conclude that the "rule" adopted by USCIS was interpretive and was not subject to the APA's notice-and-comment requirement.

FN8. Defendants do not specify whether USCIS is interpreting the statute or the implementing regulation. In this particular case, the distinction is irrelevant because Pub.L. No. 105-119 does not *authorize* USCIS to require a full criminal background check; it requires it. *Cf. Hoctor v. United States Dept. of Agriculture,* 82 F.3d 165, 169 (7th Cir.1996) (noting that an agency rule that purports to "interpret" a statute authorizing the agency to impose a duty in fact *imposes* such a duty). The question here, then, is: "what is a 'full criminal background check'?"

Plaintiffs also argue that USCIS's interpretation is unreasonable because the name check has delayed "tens of thousands of applications." Pl.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00151    Document 18-2    Filed 05/14/2008    Page 21 of 24
Page 10 of 1
Case 1:07-cv-03414    Document 30    Filed 03/04/2008    Page 17 of 49
Page 9

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
(Cite as: Slip Copy)

Opp'n at 20. The trade-off between prompt adjudication and a thorough background check falls squarely within USCIS's mandate. *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1327 (7th Cir.1990) (Deferring to the EPA's interpretation of the Superfund Amendment and Reauthorization Act: "The agency's action should be upheld, absent proof of contrary legislative intention, when the action is a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.") (internal citation and quotation marks omitted). Moreover, we are "bound to defer to [the agency's] interpretation if reasonable and statutorily permissible."*State of Wis., Dept. of Health and Social Services v. Bowen,* 797 F.2d 391, 397 (7th Cir.1986). Although the effect of the name check could arguably be overbroad in some instances, insofar as it may pick up information that is not "criminal" in nature, we do not believe that makes the name check unreasonable.

### E. Equal Protection

*\*9* Plaintiffs allege that USCIS's failure to adjudicate their applications "in a timely manner as compared to other similarly situated applicants" violates their right to equal protection of the laws. (Compl. § 72.) The equal protection component of the Fifth Amendment "essentially is a direction that all persons similarly situated should be treated alike."*Vision Church v. Village of Long Grove,* 468 F.3d 975, 1000 (7th Cir.2006) (citing *Plyler v. Doe,* 457 U.S. 202, 216 (1982)). Where, as here, "no suspect class or fundamental right is involved," we employ a rational basis test. *Id.* at 1000-01."This standard is extremely respectful of legislative determinations and essentially means that we will not invalidate a statute unless it draws distinctions that simply make no sense."*United States v. Jester,* 139 F.3d 1168, 1171 (7th Cir.1998). In addition, plaintiffs must allege that disparate treatment is the result of intentional and purposeful discrimination.*Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264-66 (1977).

Plaintiffs rely primarily on *Kaplan* to support their equal protection claim. *See Kaplan,* 481 F.Supp.2d at 393. The plaintiffs in *Kaplan* were humanitarian refugees and asylees who were receiving supplementary security income ("SSI") benefits. *Id.* at 376.Pursuant to 8 U.S.C. § 1612(a)(2), the government terminated their SSI benefits after seven years, even though their applications for naturalization and legal-permanent-residency status were still unresolved. *Id.* at 376-77.Recognizing the potential gap in SSI coverage, USCIS implemented an expedition policy ("Memorandum 22") intended to assist asylees. The plaintiffs alleged, however, that Memorandum 22 was of limited use because USCIS "implement[ed] it unevenly, honoring some expedite requests while ignoring others."*Id.* at 380.The *Kaplan* plaintiffs claimed that "the different timeliness in the processing of humanitarian immigrants' applications violate[d] the Equal Protection Clause."*Id.* at 377.Specifically, the plaintiffs alleged that in some years and in some USCIS offices the application backlogs were greater than others, and that some offices honored expedition requests while others did not. *Id.* at 392.The *Kaplan* court concluded that the plaintiffs could not state a claim for violation of their right to equal protection based on unintended naturalization-application backlogs. *Id.* at 395.The plaintiffs did not allege that the USCIS "intends for backlogs to build up unequally at different times or in different offices."*Id.* The court concluded that the plaintiff could, however, state a claim based on USCIS's arbitrarily uneven application of Memorandum 22. *Id.* at 396.Similarly situated applicants-all of whom were eligible for expedited processing-were treated differently. *Id.*

Here, plaintiffs allege that the "reference" name check is applied to all naturalization applicants. (Compl.¶ 47.) For a significant number of applicants, this process does not delay their applications. (Compl.¶ 33.) For others, including plaintiffs, the name check holds-up their applications for months and even years. But unlike USCIS's uneven application of Memorandum 22 in *Kaplan,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00151    Document 18-2    Filed 05/14/2008    Page 22 of 24
Page 11 of 1:
Case 1:07-cv-03414    Document 30    Filed 03/04/2008    Page 18 of 49
Page 10

Slip Copy
Slip Copy, 2007 WL 2788841 (N.D.Ill.)
**(Cite as: Slip Copy)**

Plaintiffs have not alleged that defendants have purposefully favored one class of applicants over another when implementing the name-check. Instead, plaintiffs allege that the effect of defendants' even-handed application of the name check is that some applications take longer to process. But plaintiffs have not alleged that USCIS intends for this "disparate effect" to occur. *See Kaplan,* 481 F.Supp.2d at 395.

*10 Even if plaintiffs had alleged purposeful discrimination, their claim would still fail because USCIS had a rational basis for implementing the name check procedure.[FN9]Plaintiffs allege that the name check only "rarely, if ever" reveals derogatory information that cannot be obtained using faster, more efficient methods. But the question is not whether the name check is good policy; the question is whether it is rational in relation to a legitimate interest. *United States v. Jester,* 139 F.3d 1168, 1171 (7th Cir.1998) ("[W]e will not invalidate a statute unless it draws distinctions that simply make no sense.").[FN10] USCIS has a legitimate interest in ensuring that naturalization benefits are conferred on worthy individuals. *Omeiri,* 2007 WL 2121998, at *3 ("The purpose of the background checks within the context of the Immigration and Naturalization Act is to ensure that only worthy applicants are granted the privilege of United States citizenship."). We do not believe that the presence of an applicant's name in an FBI file is so unlikely to reveal derogatory information that the records search is irrational.

> FN9. Plaintiffs concede as much when they note that defendants may properly distinguish between name checks with a "hit" and those without "hits". (Pl. Opp'n. at 15 n. 7.)

> FN10. The Ombudsman's Report generally describes an overtaxed system lacking the resources required to adjudicate the many name check requests that the FBI receives. Moreover, it raises legitimate questions about whether the benefits of the program

outweigh its costs. But these are policy issues better addressed to the political branches of government.

### CONCLUSION

Defendants' Motion to Dismiss Under Fed.R.Civ.P. 12(50) is granted in part and denied in part. As explained in the order of this date, we grant defendants' motion to dismiss Counts I-V of plaintiffs' complaint. We deny defendants' motion to dismiss Count VI pursuant to Fed.R.Civ.P. 12(b)(1). We have jurisdiction to adjudicate plaintiffs' applications, but nevertheless remand to USCIS. Accordingly, we dismiss Count VI of plaintiffs' complaint requesting adjudication pursuant to § 1447(b).

N.D.Ill.,2007.
Antonishin v. Keisler
Slip Copy, 2007 WL 2788841 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Order Form (01/2005)    Case 1:07-cv-03414    Document 35    Filed 03/17/2008    Page 1 of 1

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 3414 | **DATE** | 3/17/2008 |
| **CASE TITLE** | ABDIFATAH MOHAMED vs. RUTH DOROCHOFF, ET AL | | |

**DOCKET ENTRY TEXT**

Bench trial held. The court orally enters its findings of fact and conclusions of law. For the reasons stated in open court, judgment is entered for defendants Ruth Dorochoff and Robert Mueller and against plaintiff Abdifatah Mohamed. Defendants' summary judgment motion [28] is moot.

*Suzanne B. Conlon*

Notices mailed by Judicial staff.

00:45

| | Courtroom Deputy Initials: | WH |
|---|---|---|